UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| VS. § | CRIMINAL ACTION NO. 2:14-CR-793-1 |
| § | |
| JOAQUIN VASQUEZ-GUTIERREZ § | |

## ORDER GRANTING MOTION TO SUPPRESS EVIDENCE

Before the Court is Defendant's motion to suppress evidence. D.E. 13. The Defendant is charged by indictment with the offense of possession with the intent to distribute over five kilograms of cocaine. D.E. 4. The cocaine was discovered as a result of a secondary inspection of a vehicle at an immigration border patrol checkpoint in Sarita, Texas. The issue is whether Border Patrol Agent Lisa Taranto[1] (Agent Taranto) and Border Patrol Agent Arturo Valdez[2] (Agent Valdez) acted outside of the parameters of the Fourth Amendment in performing a search of the vehicle in the secondary inspection area, where they found the cocaine in boxes under the floorboards of the driver and front passenger seats. For the reasons set out below, the motion is GRANTED.

## FACTS

On October 12, 2014, Defendant was driving a passenger vehicle through the Sarita, Texas border patrol checkpoint. All of the highway traffic is routinely required to

---

[1] Agent Taranto is a United States Border Patrol Agent with five years' experience, assigned to the primary inspection lane of the Sarita Checkpoint. She testified that she had experience with hundreds of thousands of cars passing through the Checkpoint.

[2] Agent Valdez is a United States Border Patrol Agent with eleven years' experience. Five of those years were spent doing primary inspections at the Checkpoint. The balance of his experience has been as a canine handler, including two years as a Canine Handler Instructor. He has been teamed with his current three-year-old canine for nearly a year.

go through the checkpoint for immigration inspection purposes. Only one lane of traffic was open at the time and only two agents—Agents Taranto and Valdez—were assigned to, and present in, the primary inspection area. Both were armed with handguns. Drivers are not free to leave the primary inspection area until the agent allows them to do so.

As Defendant's vehicle approached inspection, the border patrol license plate reader displayed a "TECS hit" to Agent Taranto. That hit provided a "be on the lookout" alert for the license plate that was on Defendant's vehicle as being suspected of having been outfitted with a metal box positioned under the driver's floorboard for purposes of smuggling human body parts or organs. This type of alert is very unusual. Agent Taranto made Agent Valdez aware of the alert and he also testified that the alert was highly unusual.

Agent Taranto obtained the Legal Permanent Resident identification cards of Defendant and his passenger and proceeded to input their information into the border patrol computer to verify that the cards were genuine and that they accurately reflected the respective identities of Defendant and his passenger. During that time, Agent Valdez, a canine handler, allowed his canine to conduct free air sniffs around the rear of the vehicle. The canine did not alert.

Agent Valdez, who is fluent in Spanish, asked Defendant in Spanish where he was going and Defendant responded in Spanish with street names, which Agent Valdez thought was odd. So he asked again and Defendant said they were on their way to Houston. At that time, Agent Valdez asked Defendant to consent to a search of his trunk.

Defendant agreed and manually released the latch for the trunk, himself, from inside the car. The canine sniffed inside the trunk and still did not alert.

If border patrol agents want to search a vehicle based on the driver's consent, they ask for permission to do so. If the driver refuses, which Agent Valdez testified happens about once a month, the driver is free to proceed down the highway. There are no additional consequences.

Because of the license plate TECS hit, Agent Taranto asked if Defendant would allow the inspection of his vehicle. Agent Taranto is not fluent in Spanish, but learned in her border patrol training certain phrases required for her duties. She said to Defendant, "Permitame revisar su carro en secondaria," which she understood to mean, "Please allow me to search your vehicle in secondary." D.E. 22, p. 15. When he agreed, Agent Taranto directed him to drive to the secondary inspection area. The elapsed time that Defendant spent in primary inspection was just under two minutes, as reflected in the videotape of the event presented as Government's Exhibit 1. Agent Taranto testified that an immigration inspection involving Legal Permanent Resident identification cards and basic questions regarding who owns the car, whether they are citizens, and where they are coming from and going to routinely takes less than two minutes.

Defendant drove his vehicle to an area near where he had been directed, adjacent to puddles, and another border patrol agent had the occupants get out of the car and wait in the waiting area while the search of the vehicle was conducted. Drivers and their passengers are not permitted to leave the secondary inspection area until an agent directs them to leave. Agent Valdez began a systematic search with his canine by allowing the

dog to enter the trunk. The canine, trained to alert for controlled substances and not trained to alert for body parts, alerted to the floor of the trunk. Because Agent Valdez did not want wet dog paws to soil the interior of the car, he moved the vehicle to a dry area and allowed the canine inside the passenger area of the car. In the course of the ensuing search, the canine again alerted to the floor of the trunk. The canine did not alert to the floorboards at the driver's or passenger's seats.

Agent Valdez secured the canine in its crate and, acting on the prior TECS hit, raised the flooring below the driver's and passenger's seats and discovered metal boxes, lined with lead, in the floorboards. Inside the boxes were cellophane bundles of a white powdery substance that tested positive for cocaine. All of this occurred before Agent Taranto could be relieved of her primary inspection duties and join Agent Valdez in the secondary inspection.

## APPLICABLE LAW

The scope of immigration checkpoint stops "is limited to the justifying programmatic purpose of the stop: determining the citizenship status of the persons passing through the checkpoint." *United States v. Machuca–Barrera*, 261 F.3d 425, 433 (5th Cir. 2001). "The permissible duration of an immigration checkpoint stop is therefore the time reasonably necessary to determine the citizenship status of the persons stopped." *Id*. "This would include the time necessary to ascertain the number and identity of the occupants of the vehicle, inquire about citizenship status, request identification or other proof of citizenship, and request consent to extend the detention." *Id*. A brief stop at a

border patrol checkpoint that lasts no longer than necessary to fulfill its immigration-related purpose does not violate the Fourth Amendment. *Id*. at 429.

"If the initial, routine questioning generates reasonable suspicion of other criminal activity, the stop may be lengthened to accommodate its new justification." *Id*. at 434. "Thus, an agent at an immigration stop may investigate non-immigration matters beyond the permissible length of the immigration stop if and only if the initial, lawful stop creates reasonable suspicion warranting further investigation" or if the agents obtain the driver's voluntary consent. *Id.* Where no reasonable suspicion warranting further investigation exists, it is unlawful to prolong the detention of a traveler beyond the time necessary to accomplish the primary purpose and legal justification for the checkpoint. *United States v. Portillo–Aguirre*, 311 F.3d 647, 655 (5th Cir. 2002). Even when a defendant consents to a search, that consent may be invalid if it was given while he was under an illegal detention and no circumstances intervened between the detention and consent. *United States v. Jaime*, 473 F.3d 178, 182 (5th Cir. 2006).

## DISCUSSION

Defendant has asserted two bases for his motion to suppress. First, Defendant urges that the Agents could not have had a reasonable suspicion to search Defendant's car. That is because the concept that body parts could be smuggled in such a way is patently preposterous. D.E. 13, p. 3. Defendant further argues that the "collective knowledge" of all of the officers involved cannot support reasonable suspicion because the initial alert, the TECS hit, was not supported by reasonable suspicion. *Id.* at 4. Second, Defendant argues that he could not give effective consent to any search because

he had already been detained and was surrounded by armed officers, and the "request" to search was a "command," making any alleged consent involuntary.

### A. Reasonable Suspicion

Agents Taranto and Valdez do not rely on any "reasonable suspicion" to support their search of Defendant's car. Neither "reasonable suspicion" nor "probable cause" appear in the transcript of the testimony. Instead, the Agents rely on Defendant's consent. In seeking consent, the motivations behind the agents' questions are not constitutionally significant. *United States v. Garcia*, 412 Fed. App'x 693, 696 (5th Cir. 2011) (citing *Machuca-Barrera*, 261 F.3d at 434). If Defendant's consent was obtained, the Agents could extend the detention and make their search. *United States v. Martinez-Fuerte*, 428 U.S. 543, 567 (1976). The initial immigration detention was no longer than necessary and did not violate the Fourth Amendment. Thus the only question for the Court is whether Defendant's consent was effective as voluntary.

### B. Effective Consent

The Fifth Circuit has stated the test to be applied in determining whether a Defendant effectively consented to a search under the Fourth Amendment:

> Consent to search must be given knowingly and voluntarily under the 'totality of the circumstances.' We have outlined six primary factors to consider in making this determination: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedure; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. All of these factors are relevant, but none of the six is dispositive.

*United States v. Tedford*, 875 F.2d 446, 451-52 (5th Cir. 1989) (citations omitted).

**Voluntariness of custodial status**. The Fifth Circuit's analysis in *Machuca–Barrera* controls the disposition of this issue. In *Machuca–Barrera*, the defendant drove his car to an immigration checkpoint where he was questioned by a border patrol agent about his travel plans and citizenship. The defendant responded that he was a United States citizen residing in Pecos, Texas, and was returning from a trip to Mexico. At this point, the agent asked the defendant if he was carrying any firearms or drugs, and the defendant replied that he was not. The agent requested consent to search the car, which the defendant gave. Upon searching the car, marijuana was discovered hidden inside of a speaker box. *Machuca–Barrera*, 261 F.3d at 429–30.

In affirming the district court's denial of the defendant's motion to suppress the evidence of marijuana, the Fifth Circuit held that "because the brief stop . . . lasted no longer than necessary to fulfill its immigration-related purpose, the stop did not violate the Fourth Amendment." *Id*. at 429. The court considered only the time "up to the point at which [the defendant] consented to a search . . . because "[a]fter [the defendant] consented to a search, [the agent] needed no justification to prolong the encounter." *Id*. at 435. The court noted that the agent's questioning of the defendant for no more than a couple of minutes was within the permissible duration of an immigration checkpoint stop. *Id*. at 435.

Similarly, in this case, when Defendant drove up to the Sarita Checkpoint, Agent Taranto confirmed his status as a Legal Permanent Resident. Then, just like the agent in *Machuca–Barrera*, Agent Taranto and Agent Valdez sought Defendant's consent to

search. Based on the videotape of record (which tracked the time of day within seconds) and the testimony at the suppression hearing, Defendant was detained for immigration purposes for no more than two minutes before he consented to the secondary search. The Court finds that Defendant consented to a search when he unlatched the trunk and when he drove to the secondary inspection area. Because the questions concerning Defendant's immigration status and the request to search occurred within the permissible duration of an immigration checkpoint stop, there is no basis for the argument that the consent given by Defendant was invalidated because he was under an illegal detention.

**Coercive Police Procedure**. Defendant's argument that the checkpoint was "swarming with armed, uniformed officers" is not supported by the evidence. Only two visible officers, calmly inspecting each vehicle as it arrived, is not so intimidating as to nullify consent to search. No weapons were brandished and Defendant offered no evidence of other coercive tactics and none were apparent from the Agents' testimony or the videotape of the initial checkpoint encounter. Questions regarding the voluntariness of Defendant's consent will be addressed below.

**Defendant's Cooperation**. Defendant and his passenger fully complied with all of the Agents' requests. They produced their Legal Permanent Resident identification cards, answered questions in detail, voluntarily activated the interior button that unlatched the trunk so that Agent Valdez and his canine could search it, and personally drove the vehicle to the secondary inspection area for the purpose that it be more fully searched.

**Defendant's Education and Intelligence**.  There is no evidence that Defendant lacked the necessary education or intelligence to understand the situation and the consequences of his consent to a search.  While he spoke Spanish with the Agents, there is no evidence of a failure to accurately communicate.

**Defendant's Belief that No Incriminating Evidence Will Be Found**.  Defendant's willingness to open the trunk and consent to the searches is some indication that he did not believe that the Agents would find any incriminating evidence.

**Defendant's Awareness of Right to Refuse Consent**.  The Government concedes that Defendant was not specifically informed of his right to refuse consent.  However, "apprising a suspect of the right to refuse consent is not require to render consent voluntary."  *United States v. Gonzales*, 842 F.2d 748, 755 (5th Cir.1988), *overruled on other grounds*, *United States v. Hurtado*, 905 F.2d 74, 75 (5th Cir. 1990) (holding that government's burden of proof is preponderance of the evidence, citing *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974)); *United States v. Sutton*, 850 F.2d 1083, 1085 (5th Cir. 1988).  Furthermore, there is no evidence that such a warning would have made a difference.

The only argument left for Defendant is that he acquiesced in, rather than consented to, the search.  This contention is based on the specific language used to obtain the alleged consent.  There is some dispute regarding the meaning of the words Agent Taranto spoke in Spanish in order to obtain Defendant's consent to the secondary inspection.  Agent Taranto testified that it was her understanding that she was asking "please permit me" to conduct the search.  Defendant argues that the words used, which

did not include "please" in Spanish, were a "command" to comply rather than a "request" to allow. The Court considers this question under the standard of objective reasonableness: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

The Interpreter at the hearing noted that the Spanish phrase "permitame revisar" does not include the English equivalent of "please." D.E. 22, p. 32. Defendant provided briefing to support that conclusion, which the Government has not disputed. So the language that the Court is evaluating is the equivalent of "allow me to search your car in secondary." Defendant argues that the use of "allow" may be polite, but is still an instruction rather than a request for consent. This Court agrees.

First, Defendant argues that interpretation of the phrase as a command is corroborated by the fact that Agent Taranto testified that no one had ever refused her request using the "allow me" language. In contrast, Agent Valdez, who is fluent in Spanish but did not remember the precise phrase he uses, has had drivers refuse his requests for consent. Without more evidence regarding the phrasing used by Agent Valdez, the Court does not find any disparity in the Agents' respective success in obtaining compliance with searches to be reliable evidence of the drivers' (or a reasonable person's) specific interpretations.

Second, Defendant argues that the intonation that the Agent used, as demonstrated during her testimony, did nothing to transform the imperative instruction into a request for consent. The Government has not disputed this argument. Agent Taranto merely

recited the phrase that she used to gain consent in response to attorney questioning so there is no evidence before this Court as to how the phrase was actually uttered at the time under consideration. The question of intonation is not helpful under this evidence.

Third, Defendant argues that the instruction was accompanied by a gesture toward the secondary inspection area further emphasizing that the phrase was an instruction rather than a question. However, as the Government points out, the testimony indicates that the phrase was followed by the gesture, specifying where the driver should park, only after the consent was obtained. The videotape of the exchange does not include audio and does not controvert the Agents' testimony that Defendant's consent preceded the gesture. The timing of the Agent's gesture does not support the Defendant's argument that consent was not voluntary.

Fourth, Defendant notes that the checkpoint environment is not conducive to requests, as opposed to instructions. He points out that the Agents were in uniform with sidearms, that Defendant's car was pulled up to a "stop" sign, that he was not free to leave the checkpoint until released by the Agents, and that the canine unit had already conducted a preliminary search of the vehicle. However, without proof of coercive law enforcement procedures, such as the brandishing of weapons or threats, the presence of law enforcement does not preclude voluntary consent. *See United States v. Outlaw*, 134 F.Supp.2d 807, 819 (W.D. Tex. 2001). The checkpoint environment does not eliminate the ability to give voluntary consent. *See Machuca-Barrera, supra.*

The question, then, is whether "allow me" is equivalent to such language as "may I," "can I," "would you permit me," or "do you mind if I," which are all parts of

expressions that have been approved as appropriate questions from law enforcement that support a finding of voluntary consent, even without the word, "please." *See e.g., United States v. Rich*, 992 F.2d 502, 504 (5th Cir. 1993); *United States v. Lopez*, 911 F.2d 1006, 1010 (5th Cir. 1990); *United States v. Zamoran-Coronel*, 231 F.3d 466, 468 (8th Cir. 2000); *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007).

The Fifth Circuit has held that, "[A]ny words, when viewed in context, that objectively communicate to a reasonable individual that the officer is requesting permission to examine the vehicle and its contents constitute a valid search request for Fourth Amendment purposes." *Rich*, 992 F.2d at 506. The Court finds that the "permit me" language used by Agent Taranto was not a request for permission on this record. Therefore, the Court holds that the Government has not shown that Defendant's consent was voluntary and the search was reasonable.

## CONCLUSION

For the reasons stated above, Defendant Joaquin Vasquez-Gutierrez's motion to suppress evidence (D.E.13) is GRANTED.

ORDERED this 2nd day of February, 2015.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE